**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

KB HOME JACKSONVILLE LLC,

       Plaintiff,

                                      Case No. 3:18-cv-371-J-34MCR

v.

LIBERTY MUTUAL FIRE INSURANCE
COMPANY and IRONSHORE SPECIALTY
INSURANCE COMPANY,

       Defendants.

_____/

## ORDER

      **THIS CAUSE** is before the Court on Defendant Liberty Mutual Fire Insurance

Company's Motion for Partial Summary Judgment on the Duty to Defend (Doc. 44; Motion),

filed on September 14, 2018.  Plaintiff KB Home filed a response in opposition on October

5, 2018.  See Plaintiff KB Home Jacksonville LLC's Opposition to Defendant Liberty Mutual

Fire Insurance Company's Motion for Partial Summary Judgment on the Duty to Defend

(Doc. 48; Response).  Accordingly, the Motion is ripe for review.

**I.      Background**[1]

      **A.     The Underlying Florida Litigation**

      This insurance coverage dispute arises out of almost 100 lawsuits filed in 2017 in

Florida state court (the Florida Litigation) by individual homeowners against KB Home

regarding KB Home's allegedly defective construction and development of 6 residential

developments in St. Johns County and Clay County, Florida (the Project).  See Amended

_____

[1] The facts recited in this section are either undisputed, or any disagreement has been indicated.
See T-Mobile South LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008).

Complaint (Complaint; Doc. 14), Exhibit 5: Homeowner Claims Against KB Home (Doc. 14-5).  KB Home served as the general contractor for the Project and, in doing so, utilized various subcontractors.  See Complaint at 4.  As relevant here, as part of the Project, in 2006, KB Home subcontracted with Florida State Plastering, LLC (FSP) to install stucco.  See id., Exhibit 1: Subcontract (Doc. 14-1).

### B.   The Insurance Policies

During the Project, Liberty Mutual insured FSP under two consecutive commercial general liability insurance policies (the Policies), which together provided coverage from February 1, 2007 to February 1, 2009.  See id., Exhibit 2: 2007-08 Liberty Mutual Policy (Doc. 14-2; 2007 Policy); Exhibit 3: 2008-09 Liberty Mutual Policy (Doc. 14-3; 2008 Policy).[2] In addition to FSP, the Policies identified South Carolina State Plastering, LLC (SCSP) and Integrity Wall Systems, LLC (Integrity), among others, as named insureds.  See 2008 Policy at 2, 13.  The parties agree that KB Home is an additional insured under the Policies.  See Complaint at 5-6; Motion at 6; Joint Notice of Partial Settlement and Motion for Approval of Briefing Schedule (Doc. 41; Joint Notice) at 2.  The Policies each provide a per occurrence limit of $1,000,000, a general aggregate limit of $2,000,000, and a products/completed operations aggregate limit of $2,000,000.[3]  See 2008 Policy at 9.  Importantly, the Policies provide that Liberty Mutual's "right and duty to defend ends when

---

[2] The relevant provisions in the two Policies appear to be substantively identical.  Thus, the Court will simply cite to the page where the language appears in the 2008 Policy.  In addition, because the Policies are not consecutively paginated, the Court will cite to the Policies using the page numbering assigned by the Court's CM/ECF docketing system.

[3] The Policies also appear to have a "per project and per location combined aggregate limit" of $10,000,000, which neither party discusses.  See 2008 Policy at 7, 37-38.

we have used up the applicable limit of insurance in the payment of judgments or settlements . . . ." Id. at 65.

### C.    The Instant Action and the South Carolina Litigation

On March 19, 2018, KB Home initiated the instant declaratory judgment action seeking a declaration that Liberty Mutual is obligated to defend KB Home in the Florida Litigation. See Original Complaint (Doc. 1). Specifically, KB Home contends that because the underlying complaints in the Florida Litigation allege that FSP's defective stucco installation resulted in property damage to other parts of the Project, Liberty Mutual has a duty to defend KB Home in that litigation as an additional insured under the Policies. See Complaint at 2. On August 20, 2018, the parties informed the Court that Liberty Mutual "agree[d] that its defense obligation was triggered" by the allegations of the underlying complaints.[4] See Joint Notice at 2. However, Liberty Mutual asserts that its duty to defend KB Home ended on June 2, 2017, when Liberty Mutual offered its policy limits to settle an unrelated class action against SCSP, Integrity, and other additional insureds in South Carolina state court (South Carolina Litigation). See generally Motion.

The South Carolina Litigation consists of more than 4,000 lawsuits against SCSP, Integrity, and Del Webb (an additional insured under the Policies), among others, regarding their allegedly defective construction and development of a retirement community known as Sun City Hilton Head by Del Webb. See generally Grazia v. South Carolina State

---

[4] Because the parties agreed that Liberty Mutual had a duty to defend KB Home in the Florida Litigation, KB Home withdrew its pending motion for summary judgment on that issue. See Joint Notice; August 23, 2018 Order (Doc. 42); Plaintiff KB Home Jacksonville LLC's Motion for Partial Summary Judgment Against Defendant Liberty Mutual Fire Insurance Company and Incorporated Memorandum of Law (Doc. 29).

Plastering, LLC, Case No. 2007-CP-1936 (14th Jud. Cir., Beaufort County, SC).[5]  See also

Defendant Liberty Mutual Fire Insurance Company's Memorandum in Opposition to

Plaintiff KB Home Jacksonville, LLC's Motion for Partial Summary Judgment, Exhibit 1:

Declaration of Eric Rinehimer (Doc. 40-1; Rinehimer Declaration).  On May 31, 2017, Del

Webb demanded that Liberty Mutual pay the remainder of the Policies' limits to settle the

South Carolina Litigation.  See Rinehimer Declaration, Exhibit 7: Demand Letter (Doc. 40-

7).  Specifically, Del Webb demanded "that Liberty Mutual pay the entirety of its remaining

limits on behalf of both Del Webb and [SCSP] to the trust account of Del Webb's defense

counsel . . ." as well as $2,500,000 in defense costs.  Id. at 2.  In doing so, Del Webb noted

"that Liberty Mutual has approximately $2.3 to $2.4 Million of available limits remaining on

the Policies whether said amounts are based on the per occurrence, general aggregate or

products completed operations hazard limits as set forth on the declarations pages of the

Policies."  Id. at 1-2.  Del Webb stated that its "settlement demand [was] being made with

---

[5] Rule 201(b) of the Federal Rules of Evidence allows a court to take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Notably, courts may take judicial notice of documents from a different court proceeding because they are matters of public record and "capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned."  Horne v. Potter, 392 F. App'x 800, 802 (11th Cir. 2010).  However, a "'court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'"  United States v. Jones, 29 F.3d 1549, 1553 (11th Cir. 1994) (quoting Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc., 969 F.2d 1384, 1388 (2d Cir. 1992)).  As such, "a court may take judicial notice of another court's order only for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation."  Jones, 29 F.3d at 1553.  Therefore, the Court will take judicial notice of the South Carolina court proceedings for the limited purpose of recognizing the procedural posture of that litigation and the filings relevant to the settlement of that litigation.  Indeed, both parties rely on filings from the South Carolina Litigation to support their respective positions.  See Plaintiff KB Home Jacksonville LLC's Motion for Leave to File Supplemental Summary Judgment Evidence (Doc. 51; KB Home's Motion to File Supplemental Evidence); Defendant Liberty Mutual Fire Insurance Company's Notice of Filing Supplemental Authority in Support of its Motion for Partial Summary Judgment on the Duty to Defend (Doc. 66; Liberty Mutual's Notice of Filing Supplemental Authority).

the understanding that the Liberty Mutual policies issued to [Integrity] and [SCSP] [would]

be fully exhausted through the payment of this claim." Id. at 2.

On June 2, 2017, Liberty Mutual responded to the Demand Letter with the following

settlement offer:

1. <u>Payment of remaining policy limits of approximately $2,300,000.00 directly to plaintiff</u> in return for a full release of the damage claims during our policy periods up to the amount of settlement, protecting both [SCSP] and Del Webb to the full extent of payment.

2. Payment of $156,250.00 to Del Webb in full and complete satisfaction of Liberty Mutual's defense obligation.

3. An Order that policy limits have been exhausted, that Liberty Mutual's indemnity obligation has been fully satisfied and that no defense obligation exists beyond this settlement as to either [SCSP] or Del Webb.

See Rinehimer Declaration, Exhibit 8 (Doc. 40-8): Response Letter at 1 (emphasis added).[6]

In the Response Letter, Liberty Mutual also noted the existence of a second letter from Del

Webb dated May 31, 2017 (that the parties have not submitted to the Court), in which Del

Webb objected to Liberty Mutual paying its policy limits directly to the plaintiffs without Del

Webb's consent. See id. at 3. With regard to this objection, Liberty Mutual advised Del

Webb that it had "been asked to participate in the Right To Cure ('RTC') offer process.

Participation would include commitment of the remaining limits of the policies and, <u>if</u>

<u>accepted</u>, would be direct payments to individual plaintiffs in return for an individual release

of claims against [SCSP] and Del Webb." Id. (emphasis added).   Seeking further

---

[6] KB Home argues that "[n]either the [Rinehimer] Declaration nor any exhibit [attached thereto] constitutes admissible evidence that may be considered by the Court." See Response at 15-17. However, because the Court ultimately concludes that partial summary judgment is inappropriate even considering these documents, the Court need not address this argument.

clarification of Del Webb's May 21, 2017 letters and Del Webb's position regarding Liberty

Mutual's participation in the Right to Cure process, Liberty Mutual stated:

> The first letter demanded that [Liberty Mutual] pay the remaining limits to Del Webb to be held in escrow.  The second letter demanded that no money be paid directly to plaintiffs.  Today, we received a document purportedly authored by [Del Webb's defense counsel] indicating that "Del Webb does not object" to the RTC offers.  A conflict exists among these communications.  The RTC offers could result in payments directly to plaintiffs.  <u>Liberty Mutual cannot fund the RTC offers and pay the remaining limits into your escrow account.  We would like an express definitive statement from Del Webb on this issue.</u>

<u>Id.</u> (emphasis added).

On January 30, 2018, the South Carolina state court approved individual

settlements under South Carolina's right to cure process.  <u>See</u> Declaration, Exhibit 9:

Order Approving Individual Settlements Under the Right to Cure Process and Dismissal of

Claims/Properties from the Class (Doc. 40-9; Right to Cure Order).  In doing so, the court

stated that SCSP had "made written settlement offers to numerous members of the Class,"

and that "[a] group of homeowners/Class Members had elected to accept these offers

. . . ."  <u>Id.</u>  Notably, the Right to Cure Order does not state which of SCSP's insurers made

the right to cure payments, the amount of the payments, or the date of the payments.

On July 27, 2018, Liberty Mutual advised KB Home that

> the remaining limits of the Policies have been committed to settle a class-action suit pending in the Court of Common Pleas, Fourteenth Judicial Circuit, Beaufort County, South Carolina, under case number 2007-CP-07-01396 since at least June, 2017.  Because of this exhaustion, Liberty will not participate in the defense of KB Home for any fees and costs incurred after the date of exhaustion of the Policies.

Rinehimer Declaration, Exhibit 10: Liberty Mutual Letter to KB Home (Doc. 40-10) at 13.

On October 30, 2018, the South Carolina state court granted a motion for preliminary approval of the class action settlement.  See Liberty Mutual's Notice of Filing Supplemental Authority, Exhibit 2: Order Granting Plaintiffs' Motion for Preliminary Approval of Settlement of Class Action (Doc. 66-2; Preliminary Approval Order).  In the Preliminary Approval Order, the court stated that the "settlement involves the creation of a settlement fund in the amount of $43,034,922.39," which does not include the "$2,653,000 previously paid out as part of the Right to Cure process in this action."  Id. at 5.  The court further noted that the settlement represented "payment of not only substantially all of the insurance coverage possibly available to SCSP, but also a significant settlement contribution by Del Webb and its insurers."  Id.  Notably, the Class Action Settlement Agreement, also dated October 30, 2018, mandates that payment be made within 30 days of the court's preliminary approval.  See Grazia, Case No. 2007-CP-1936, Plaintiffs' Motion for Preliminary Approval of Settlement of Class Action, Exhibit A: Class Action Settlement Agreement (Agreement) at 7, filed on October 30, 2018.[7]  The Agreement also reflects that Liberty Mutual is responsible for paying $715,671.36 toward the total settlement amount.  Id. at 8.  The Agreement further provides "that $2,653,000 has already been paid to homeowners through the Right to Cure Process," but the Agreement does not state which insurer(s) participated in the RTC process, how much

---

[7] Because the instant Motion became ripe before the Settlement Agreement was filed in the South Carolina Litigation, KB Home could not submit the Settlement Agreement in support of its Response.  However, KB Home has since filed a motion for leave to supplement its summary judgment evidence with the Settlement Agreement, see KB Home's Motion to File Supplemental Evidence, which Liberty Mutual has opposed, see Defendant Liberty Mutual Fire Insurance Company's Memorandum of Law in Opposition to Plaintiff's Motion for Leave to File Supplemental Summary Judgment Evidence (Doc. 54).  Because the Court has already taken judicial notice of the South Carolina Litigation, KB Home's Motion to File Supplemental Evidence will be denied as moot.

money they contributed, or when the insurers made the payments.  Id.  The South Carolina state court granted final approval of the class action settlement on April 19, 2019.  See Liberty Mutual's Notice of Filing Supplemental Authority, Exhibit 1: Order Granting Final Approval of Settlement of Class Action (Doc. 66-1; Final Approval Order).

## II.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Rule 56(c)(1)(A).[8]  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."  Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

---

[8] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive."  Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013).  Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.    Applicable Law

"Under Florida law, insurance contracts are 'construed according to their plain meaning, with any ambiguities construed against the insurer and in favor of coverage.'"[9] See Amerisure Mut. Ins. Co. v. Auchter Co., 673 F.3d 1294, 1301 (11th Cir. 2012) (quoting U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 877 (Fla. 2007)).  When construing an insurance policy, a court "'should read each policy as a whole, endeavoring to give every

---

[9] This case is before the Court based on its diversity jurisdiction.  See Complaint ¶¶ 2, 4-7.  As such, the Court applies the substantive law of the forum state, Florida.  See Auto-Owners Ins. Co. v. E.N.D. Servs., Inc., 506 F. App'x 920, 923 n.2 (11th Cir. 2013).  The parties do not dispute that Florida law applies.  See generally Motion at 7-10; Response at 7-12 (each applying Florida law).

provision its full meaning and operative effect.'" J.S.U.B., 979 So. 2d at 877 (quoting Auto-Owners Ins. Co. v. Anderson, 756 So. 2d 29, 34 (Fla. 2000)).  However, "'[a] court cannot rewrite an insurance contract to extend coverage beyond what is clearly set forth in the contractual language.'" Szczeklik v. Markel Int'l Ins. Co., 942 F. Supp. 2d 1254, 1260 (M.D. Fla. 2013) (quoting Fla. Residential Prop. & Cas. Joint Underwriting Ass'n v. Kron, 721 So. 2d 825, 826 (Fla. 3d Dist. Ct. App. 1998)).  Significantly, "[a]ny doubts as to whether there is a duty to defend in a particular case must be resolved against the insurer and in favor of the insured."  Category 5 Mgmt. Group, LLC v. Companion Prop. & Cas. Ins. Co., 76 So. 3d 20, 23 (Fla. 1st Dist. Ct. App. 2011).  Nevertheless, so long as it acts in good faith, an insurer may terminate its defense obligation through exhaustion of its policy limits.  See Godur v. Travelers Indem. Co., 567 So. 2d 1028, 1030 (Fla. 3d Dist. Ct. App. 1990) (holding that the duty to defend ended when the insurer paid its policy limits through settlement with the injured party and obtained a release on behalf of the insured).

## IV.    Analysis

In moving for partial summary judgment, Liberty Mutual argues that its duty to defend KB Home in the Florida Litigation ended on June 2, 2017, when it exhausted the limits of the Policies by committing the Policies' limits to settle the South Carolina Litigation.  See Motion at 7-10.  In support of this argument, Liberty Mutual asserts that "a policy exhausts at the time of settlement, despite the fact that the payment of that settlement might not occur until a later date."  Id. (citing State Farm Mut. Auto. Ins. Co. v. InterAmerican Car Rental, Inc., 781 So. 2d 500 (Fla. 3d Dist. Ct. App. 2001)).  Liberty Mutual also contends that its duty to defend is limited to claims regarding property damage caused by FSP, as opposed to other subcontractors.  See Motion at 10-16.  In response,

KB Home maintains that "[e]xhaustion of the Policies' limits requires actual payment of judgments or settlements," and that Liberty Mutual has failed to submit evidence of any such payment. See Response at 7. Finally, KB Home argues that Liberty Mutual's duty to defend extends to the entire lawsuit. Id. at 17-20.

At the outset, the Court notes that neither party has submitted authority applying Florida law that specifically addresses the narrow issue presented here—whether Liberty Mutual had to actually pay the Policies' limits in order to exhaust them as opposed to committing to pay them by entering into a settlement agreement. Liberty Mutual relies almost exclusively on the Florida Third District Court of Appeal's (Third DCA) opinion in State Farm to support its position that actual payment is not required. See Motion at 9-10. Liberty Mutual contends that State Farm establishes that its "duty to defend ceased on June 2, 2017, because the evidence is undisputed that this is the date that Liberty Mutual committed the Policies' limits to settle the [South Carolina Litigation]." Id. at 9. A careful review of the State Farm case and its history, however, reveals that it fails to support Liberty Mutual's contention.

In the State Farm case, State Farm's insured, Marsha Pabon, rented a van from InterAmerican on behalf of her brother. See State Farm, 781 So. 2d at 501. While driving the van, Pabon's brother was involved in an accident resulting in the death of a third party. Id. The victim's estate sued InterAmerican, which in turn sued Pabon for indemnification. Id. "State Farm refused to defend InterAmerican in the wrongful death action but did retain an attorney to defend Pabon in the indemnity action." Id. In 1992, State Farm settled with the estate on behalf of Pabon for the policy limits, but the parties agreed that State Farm would not make payment until after the resolution of the estate's case against

InterAmerican.  Id.  In May 1995, a jury returned a verdict against InterAmerican in the wrongful death suit.  Id.  State Farm paid the settlement amount two months later.  Id.  Then, in "1997, InterAmerican prevailed in its indemnity claim against Pabon."  Id.

In 1995, InterAmerican filed a separate lawsuit against State Farm for reimbursement of the attorney fees and costs that InterAmerican incurred in its defense of the wrongful death lawsuit.  See State Farm Mut. Ins. Co. v. InterAmerican Car Rental, Inc., 707 So. 2d 788, 788 (Fla. 3d Dist. Ct. App. 1998).  The trial court entered judgment in favor of InterAmerican.  Id.  State Farm appealed, and the Third DCA reversed the judgment, finding that under Section 627.7263, Florida Statutes, "State Farm had no duty to defend InterAmerican in the [ ] wrongful death suit."  Id. at 790.  On remand, InterAmerican amended its complaint to add "a claim for indemnification as a third-party beneficiary under Section 627.4136, Florida Statutes."  State Farm, 781 So. 2d at 501.  In response, State Farm argued that it had no duty to indemnify InterAmerican because it had exhausted the policy limits by paying the settlement to the estate.  The trial court disagreed, "finding there was no settlement agreement between State Farm and the [e]state."[10]  Id. State Farm again appealed, and it is that decision resolving that appeal on which Liberty Mutual relies.  See Motion at 9-10 (citing State Farm, 781 So. 2d at 502).

In that second appeal, the Third DCA framed the dispositive issue as "whether State Farm exhausted its policy limits by making payments to the parties injured in the automobile accident prior to InterAmerican obtaining a judgment against State Farm's insured for indemnification.  The answer to that question hinges upon the determination as to whether State Farm and the Estate entered into a valid settlement agreement in 1992."

---

[10] Notably, there is no discussion in the Third DCA's opinion regarding how the trial court reached this conclusion.

State Farm, 781 So. 2d at 502.  In framing the issue in this way, the court was not distinguishing between whether the policy limits were exhausted by entering into the settlement or by payment of the proceeds to the estate.  This is readily apparent because, as the facts of the case establish, State Farm paid the settlement proceeds to the estate in mid-1995 and InterAmerican did not obtain a judgment against State Farm's insured, Pabon, until 1997.  Id.  Thus, both the settlement and the payment of the proceeds occurred long before InterAmerican obtained a judgment against State Farm's insured.  The answer to the dispositive issue identified by the court hinged not upon the timing of the settlement or payment, but rather on whether the payment of the proceeds was pursuant to a "valid settlement agreement."  Id.  In the end, the Third DCA determined that "a valid and enforceable agreement did exist between the [e]state and State Farm," and as a result, State Farm had exhausted its policy limits before InterAmerican obtained the 1997 judgment against the insured.  Id. at 502.  In reaching this conclusion, the court relied on Florida law addressing the question of whether an agreement between the parties constitutes a binding settlement agreement.  Id.  And in that context noted that "the evidence is undisputed that the [e]state agreed to accept the policy limits in June of 1992. Regardless of the fact that the parties subsequently agreed payment would be made after the main case against InterAmerican was resolved, the key point is that the essential term of payment was agreed to by the parties."  Id.  This statement related to the question of whether the settlement agreement between the parties was a binding agreement, not whether it was the entering into the agreement or the payment that exhausted the policy limits.

Thus, contrary to Liberty Mutual's contention, State Farm does not support the proposition that "a policy exhausts at the time of settlement," as suggested by Liberty Mutual. See Motion at 9. More importantly, even if State Farm could be read as supporting a conclusion that under that policy, entering into a settlement exhausted the policy limits, for the reasons discussed below, without any information as to the terms of the State Farm policy, the decision is of little, if any, value in determining whether settlement or actual payment exhausted the limits of the Policies at issue here.

Although KB Home cites to Florida cases in which courts have stated that a particular insurer's duty to defend ended when it paid the policy limits, see Response at 8-9, these cases are of limited persuasive value as well because, like the Third DCA in State Farm, these courts were not deciding whether the policies at issue could be exhausted through settlement versus actual payment of the policy limits. The Court has failed to identify any controlling precedent addressing this question. However, the Court finds caselaw discussing when the duties under an excess insurance policy are triggered to be instructive. In Ali v. Federal Insurance Co., an excess insurer sought a declaratory judgment that the obligations under its liability policies had not been triggered.[11] 719 F.3d 83 (2d Cir. 2013). The excess insurance policy at issue provided that the excess insurance coverage was triggered only after the primary policy was exhausted "as a result of payment

---

[11] The Second Circuit explained excess liability policies as follows:

> "[P]rimary" insurance refers to the first layer of insurance coverage that attaches immediately upon the occurrence of a policy-defined liability or loss. See Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co., 514 F.3d 327, 329 (4th Cir. 2008). "Excess liability policies, by contrast, . . . provide an additional layer of coverage for losses that exceed the limits of a primary liability policy. Coverage under an excess policy thus is triggered when the liability limits of the underlying primary insurance policy have been exhausted." Id.; see also Olin Corp. v. Am. Home Assurance Co., 704 F.3d 89, 93 (2d Cir. 2012) (describing how excess liability policies operate).

Ali, 719 F.3d at 90.

of losses thereunder." Id. at 86 (emphasis added).  Notwithstanding this policy language, the insureds argued that the obligations of the excess insurer were triggered when the total amount of the insured's covered losses exceeded the limits of the underlying primary insurance policy, regardless of whether the underlying claims had actually been paid.  Id. at 91.  The district court granted the excess insurers' motion for judgment on the pleadings, see Fed. Ins. Co. v. Gould, Case No. 10-cv-1160(RJS), 2011 WL 4552381 (S.D.N.Y. Sept. 28, 2011), and the insureds appealed.  In affirming the district court, the Second Circuit Court of Appeals held that "'obligations' are not synonymous with 'payments' on those obligations.  To hold otherwise would make the 'payment of' language in these excess liability contracts superfluous." Ali, 719 F.3d at 91.

Similarly, in Citigroup, Inc. v. Fed. Ins. Co., the Fifth Circuit Court of Appeals examined the policy language of four excess insurance policies to determine whether a primary insurer had satisfied the requirements necessary to trigger the excess insurers' coverage obligation.  649 F.3d 367 (5th Cir. 2011).  One of the policies provided that the excess insurance coverage attached "[i]n the event of the exhaustion of all of the limit(s) of liability of such Underlying Insurance solely as a result of payment of loss thereunder." Id. at 373 (internal quotation marks omitted).  The Fifth Circuit determined that the language "payment of loss" meant that "the underlying insurer must make actual payment to the insured in order to exhaust the underlying policy," and that settlement did not meet that requirement.  Id.  See also Axis Specialty Ins. Co. v. Brickman Grp. Ltd., 458 F. App'x 220, 226 (3d Cir. 2012) (analyzing similar policy language and concluding that because actual payment did not occur "until [the primary insurer] paid the $750,000 contribution towards settling the [ ] dispute," the excess insurer's "duty to defend did not arise until that point");

Liberty Ins. Underwriters, Inc. v. Ream, Case No. 6:16-cv-03324-RK, 2018 WL 4225042, at *4 (W.D. Mo. Sept. 5, 2018) (similar); Virginia Sur. Ins. Co. v. RSUI Indem. Co., Case No. 09-cv-928-PHX-JAT, 2009 WL 4282198, at *7 (D. Ariz. Nov. 25, 2009) (similar); National Union Fire Ins. Co. v. Travelers Indem. Co., Case No. 95-cv-6798-GONZALEZ (S.D. Fla. Aug. 11, 1998) (Doc. 71) (similar).

Like the policies at issue in Ali and Citigroup, the Court finds that the plain language of the Policies in this case require exhaustion through the actual payment of the Policies' limits.  Indeed, the Policies state that Liberty Mutual's "right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements . . . ."  See 2008 Policy at 65 (emphasis added).  Offering the policy limits, or even being legally obligated to pay the policy limits at a later date, is simply not synonymous with "payment of judgments or settlements."  "To hold otherwise would make the 'payment of' language in [the Policies] superfluous."  Ali, 719 F.3d at 91. Notably, "it is well settled that an insurance policy is a contract."  Wright v. Dir., Fed. Emergency Mgmt. Agency, 913 F.2d 1566, 1570 (11th Cir. 1990).  As such, if State Farm wanted its duty to defend to terminate upon some triggering event other than actual payment, it could have contracted for that.  See Auto-Owners, 756 So. 2d at 34 ("[I]nsurance contracts are construed in accordance with the plain language of the policies as bargained for by the parties.").  But State Farm did not do so in the applicable Policies.

Applying these principles, the Court concludes that Liberty Mutual is not entitled to partial summary judgment.  This is so because the Court cannot determine whether Liberty Mutual exhausted the Policies' limits on June 2, 2017, because Liberty Mutual has not submitted evidence showing that it actually paid the Policies' limits to settle the South

Carolina Litigation on that date, or any other date for that matter. At most, the evidence demonstrates that on June 2, 2017, Liberty Mutual <u>offered</u> to Del Webb "[p]ayment of remaining policy limits of approximately $2,300,000.00[.]" <u>See</u> Response Letter at 1. However, the Response Letter also reflects that Del Webb had previously expressed reservations about Liberty Mutual's intent to settle with individual plaintiffs through the right to cure process as opposed to settling with the class. From the record, the Court cannot determine how that dispute was resolved, if it was, when Del Webb accepted Liberty Mutual's offer, or when Liberty Mutual actually made the payment of the Policies' remaining funds. Moreover, Liberty Mutual has failed to present any evidence explaining how any settlement payments were allocated in relation to the Policies' limits. Indeed, Liberty Mutual never even explains in its Motion, or more importantly by pointing to record evidence, what the relevant policy limits are, or the precise amounts it has paid in order to exhaust them. While "[s]ettlement agreements are highly favored" by Florida courts, and they should be enforced "whenever possible," <u>see</u> <u>State Farm</u>, 781 So. 2d at 501-02, the Court is not being asked to enforce a settlement agreement in this case. Instead, Liberty Mutual is asking the Court to determine that the limits of the Polices at issue in this case were exhausted on a specific date—June 2, 2017—but Liberty Mutual has failed to carry its burden in demonstrating that to be true.[12]

---

[12] In reaching this conclusion, the Court observes that Liberty Mutual asks the Court to determine that its duty to defend ended on a specific date, June 2, 2017, and does not present any alternative argument or evidence regarding the actual date of any settlement payment. As explained above, although the Class Action Settlement Agreement and other South Carolina state court documents suggest that Liberty Mutual made a large payment to individual homeowners through the right to cure process and paid $715,671.36 toward the class action settlement, there is no evidence showing what the total amount was or when the payment occurred. Thus, even if Liberty Mutual asked the Court to determine that the Policies were exhausted on the date of payment, it would not be able to do so based on the evidence currently before the Court.

The Court turns next to Liberty Mutual's argument that "[t]o the extent a duty to defend KB Home ever existed, the plain language of the Policies and case law limit that duty to defend to claims for liability caused by [FSP]. Liberty Mutual does not have and never had a duty to defend KB Home for its own liability, or for the liability of other subcontractors." Motion at 10. The Court finds this argument to be unavailing. Florida law is clear that "[i]f the complaint alleges facts partially within and partially outside the coverage of the policy, the insurer is obligated to defend the <u>entire suit</u>." <u>Category 5</u>, 76 So. 3d at 23 (emphasis added); <u>see also</u> <u>Lime Tree Village Community Club Ass'n, Inc. v. State Farm General Ins. Co.</u>, 980 F.2d 1402, 1405 (11th Cir. 1993) ("An insurer's 'duty to defend is distinct from and broader than the duty to indemnify . . . and if the [underlying] complaint <u>alleges facts showing two or more grounds for liability</u>, one being within the insurance coverage and the other not, the insurer is obligated to defend the entire suit.'" (quoting <u>Baron Oil Co. v. Nationwide Mut. Fire Ins. Co.</u>, 470 So. 2d 810, 813-14 (Fla. 1st Dist. Ct. App. 1985))). That is precisely the scenario presented here, and Liberty Mutual must defend the entire suit. Therefore, Liberty Mutual's Motion is due to be denied.

Accordingly, it is **ORDERED**:

1.      Defendant Liberty Mutual Fire Insurance Company's Motion for Partial Summary Judgment on the Duty to Defend (Doc. 44) is **DENIED**.

2.      Plaintiff KB Home Jacksonville LLC's Motion for Leave to File Supplemental Summary Judgment Evidence (Doc. 51) is **DENIED as moot**.

**DONE AND ORDERED** in Jacksonville, Florida on September 5, 2019.

MARCIA MORALES HOWARD
United States District Judge

lc23
Copies to:
Counsel of Record