**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

KB HOME JACKSONVILLE LLC,

      Plaintiff,

v.

                          Case No. 3:18-cv-371-J-34MCR

LIBERTY MUTUAL FIRE INSURANCE
COMPANY and IRONSHORE SPECIALTY
INSURANCE COMPANY,

      Defendants.

_____/

## ORDER

**THIS CAUSE** is before the Court on Plaintiff KB Home Jacksonville LLC's Motion for Partial Summary Judgment Against Defendant Ironshore Specialty Insurance Company and Incorporated Memorandum of Law (Doc. 52; Motion), filed on December 14, 2018. Defendant Ironshore filed a response in opposition on January 22, 2019. See Defendant Ironshore Specialty Insurance Company's Response in Opposition of Plaintiff KB Home Jacksonville LLC's Motion for Partial Summary Judgment and Incorporated Memorandum of Law (Doc. 57; Response). With leave of Court, see Order (Doc. 59), KB Home replied on February 12, 2019. See Plaintiff KB Home Jacksonville LLC's Reply in Support of Motion for Partial Summary Judgment Against Defendant Ironshore Specialty Insurance Company (Doc. 60; Reply). Accordingly, the Motion is ripe for review.

## I.     Background[1]

In this action, KB Home seeks declarations that the defendant insurance companies have a duty to defend KB Home in Florida state-court actions (the Underlying Litigation) filed by individual homeowners against KB Home regarding its allegedly defective construction and development of 6 residential developments in St. Johns County and Clay County, Florida (the Project).  See generally Amended Complaint (Doc. 14); Motion, Exhibit A: Declaration of Stephen S. Asay (Doc. 52-1; Asay Declaration) at 3-4.  KB Home served as the general contractor for the Project and, in doing so, utilized various subcontractors. See Amended Complaint at 4.  As relevant here, as part of the Project, in 2006, KB Home subcontracted with Florida State Plastering, LLC (FSP) to install stucco.  See Asay Declaration, Exhibit 1: Subcontract (Doc. 52-2).

### A.     The Underlying Litigation

According to KB Home, 88 complaints in the Underlying Litigation implicate FSP's stucco work on the Project, 83 of which "contain materially identical counts/claims and allegations" (the Underlying Complaints) and are the subject of the instant Motion.[2]  See Asay Declaration at 2-3.  Rather than submit all 83 Underlying Complaints to the Court, KB Home has submitted two representative complaints, see id., Exhibit 3: Complaint, Case No. CA17-0247 (Doc. 52-4; Gilbert Complaint); id., Exhibit 4: Complaint, Case No. CA17-0536 (Doc. 52-5; Rowland Complaint), and has produced all 83 Underlying Complaints to Ironshore, id. at 2-3.  KB Home has also provided a summary chart that lists all 83

---

[1] The facts recited in this section are either undisputed, or any disagreement has been indicated. See T-Mobile South LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008).

[2] Although Ironshore appears to dispute that the Underlying Complaints are in fact substantively identical, for reasons explained below, the Court finds the argument unavailing.

Underlying Complaints and identifies the specific page number on which allegations relevant to Ironshore's duty to defend appear.  See id., Exhibit 6: Underlying Complaint Summary (Doc. 52-7; Summary Chart).

In the Underlying Complaints, the homeowner plaintiffs assert claims of vicarious liability against KB Home for the negligence of its stucco subcontractor.  See Asay Declaration at 3-4; Summary Chart; Gilbert Complaint at 7-8; Rowland Complaint at 5-6. In particular, the plaintiffs allege that the stucco subcontractor's work failed to comply with the Florida building code and, as a result, the plaintiffs' homes suffer from construction defects.  Id.  They further allege that the stucco subcontractor's defective work caused "damages not only to the exterior stucco, but also the underlying wire lath, paper backing, house wrap, wood sheathing, interior walls, interior floors, and/or other property."  Gilbert Complaint at 7-8; see also Rowland Complaint at 5-6.  Although the plaintiffs do not name FSP as a defendant in the Underlying Complaints or specifically state that FSP performed the stucco work at issue, KB Home has identified FSP as the stucco subcontractor that performed that work.  See Asay Declaration at 3.

Notably, in the Underlying Complaints the plaintiffs also do not allege when the property damage occurred or when it was discovered.  Instead, the plaintiffs allege that "[s]ubsequent to construction of the Home, certain design and construction deficiencies were observed at the Home, which include, but are not limited to, an inadequately and improperly installed stucco system."  Gilbert Complaint at 3; see also Rowland Complaint at 3.  The plaintiffs further allege that "[t]he existence or causes of the defects are not readily recognizable by [p]laintiffs," and that "[t]he defects are hidden by components or finishes, are latent in nature, and are defects that require special knowledge or training to

ascertain and determine the nature and causes of the defects."  Gilbert Complaint at 3-4;

see also Rowland Complaint at 3-4.  Although the plaintiffs do not allege when FSP

completed its work on the Project, KB Home has acknowledged that FSP completed its

work in 2008.  See Amended Complaint at 4.

>    **B.    Ironshore's Policy**

Ironshore insured FSP under a commercial general liability (CGL) policy, which

provided coverage from December 1, 2009, to December 1, 2010.[3]  See Asay Declaration,

Exhibit 2: 2009-10 Ironshore Policy (Doc. 52-2; Policy).[4]  The Policy provides coverage for

"those sums that the insured becomes legally obligated to pay as damages because of

'bodily injury' or 'property damage' to which this insurance applies."  See Policy at 5.  For

the insurance to apply, the "property damage" must be "caused by an 'occurrence' that

takes place in the 'coverage territory.'"  Id.  An "occurrence" is defined as "an accident,

including continuous or repeated exposure to substantially the same general harmful

conditions."  Id. at 17.  In addition, the "property damage" must "occur[ ] during the policy

period."  Id. at 5.  The Policy defines "property damage," in relevant part, as "[p]hysical

injury to tangible property, including all resulting loss of use of that property.  All such loss

of use shall be deemed to occur at the time of the physical injury that caused it."  Id. at 17.

---

[3] Ironshore states that, in addition to the 2009-2010 Policy, it also insured FSP through a second policy that provided coverage from December 1, 2008, to December 1, 2009.  See Response at 6. However, because KB Home does not seek coverage under the 2008-2009 policy, only the 2009-2010 Policy is at issue here.  See Amended Complaint at 6; Motion at 5; Reply at 9.  As such, the Court need not address Ironshore's arguments regarding the earlier policy.  See Response at 13-14.

[4] Because the Policy is not consecutively paginated, the Court will cite to the Policy using the page numbering assigned by the Court's CM/ECF docketing system.

The Policy provides that Ironshore "will have the right and duty to defend the insured against any 'suit' seeking . . . damages for . . . "property damage." Id. at 5.

KB Home is an additional insured under the Policy, see Policy at 53, 'but only with respect to liability for 'bodily injury' or 'property damage' caused, in whole or in part, by 'your work' at the location designated and described in the schedule of this endorsement performed for that additional insured and including in the 'products-completed operations hazard.'"[5]   Id. at 54.   The Policy defines "your work" to include "[w]ork or operations performed by you or on your behalf" where "[t]hroughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy."  Policy at 5, 18.

Of particular significance to the instant dispute, the Policy includes a Continuous or Progressive Injury or Damage Exclusion (CP Exclusion) which provides as follows:

> This insurance does not apply to any "bodily injury" or "property damage":
>
> 1.      which first existed, or is alleged to have first existed, prior to the inception of this policy.  "Property damage" from "your work", or the work of any additional insured, performed prior to policy inception will be deemed to

---

[5] The Subcontract required FSP to obtain CGL insurance for itself and to have KB Home named as an additional insured.  See Subcontract at 10, 46.  Likewise, the Policy's additional insured endorsement provides:

> We shall name the person(s) or organization(s) as additional insureds to this insurance as required under a written contract with the Named Insured entered into before the claim or loss.  . . . There shall be no coverage, indemnity, defense, and/or duty to defend any person(s) or organization(s) claiming to be an additional insured under this endorsement if the claim or loss does not arise, in whole or in part, from the negligence and/or fault of the Named Insured.

Policy at 53.  Ironshore does not appear to dispute that KB Home is an additional insured under the Policy.  See generally Response at 4-5.  Instead, Ironshore suggests that KB Home is inappropriately equating itself with a named insured under the Policy, see id. at 5, and also argues that the "[t]he additional insured endorsements have not been triggered by every underlying complaint, because not every complaint claims that [KB Home] is vicariously liable for any action attributable to [FSP]," id. at 9.

have first existed prior to the policy inception, unless such "property damage" is sudden and accidental and takes place within the policy period); or

2.      which was, or is alleged to have been, in the process of taking place prior to the inception date of this policy, even if the such "bodily injury" or "property damage" continued during this policy period; or

3.      which is, or is alleged to be, of the same general nature or type as a condition, circumstance or construction defect which resulted in "bodily injury" or "property damage" prior to the inception date of this policy.

Id. at 31.

## C.    The Instant Action

On March 19, 2018, KB Home initiated the instant declaratory judgment action seeking, among other things, declarations that Liberty Mutual and Ironshore are obligated to defend KB Home in the Underlying Litigation.[6]  See Original Complaint (Doc. 1). Specifically, KB Home contends that because the plaintiffs in the Underlying Litigation allege that FSP's defective stucco installation resulted in property damage to other parts of the Project, both insurers have a duty to defend KB Home as an additional insured.  See Amended Complaint at 2.  On August 20, 2018, the parties informed the Court that Liberty Mutual "agree[d] that its defense obligation was triggered" by the allegations of the underlying complaints.[7]  See Joint Notice at 2.  However, in its motion for partial summary judgment, Liberty Mutual argued that its duty to defend KB Home ended on June 2, 2017,

---

[6] Although KB Home also asks the Court to declare that Ironshore has a duty to defend KB Home in connection with the 558 Notice process, see Amended Complaint at 14, KB Home's Motion does not ask the Court for that relief.

[7] Liberty Mutual insured FSP under two consecutive CGL insurance policies, which together provided coverage from February 1, 2007 to February 1, 2009, and named KB Home as an additional insured.  See Amended Complaint Exhibit 2: 2007-08 Liberty Mutual Policy (Doc. 14-2; 2007 Policy); Exhibit 3: 2008-09 Liberty Mutual Policy (Doc. 14-3; 2008 Policy).

when Liberty Mutual offered its policy limits to settle an unrelated class action against other insureds in South Carolina state court.  See Defendant Liberty Mutual Fire Insurance Company's Motion for Partial Summary Judgment on the Duty to Defend (Doc. 44; Liberty Mutual's Motion).  The Court denied Liberty Mutual's Motion in a separate order also dated September 5, 2019.

In the instant Motion, KB Home asks "that the Court enter an order finding, as a matter of law, that the allegations in the Underlying Complaints trigger Ironshore's duty to defend KB HOME in the Underlying [Litigation]."  Motion at 16.  In response, Ironshore argues that KB Home is not entitled to partial summary judgment because there are material facts in dispute and therefore the Motion is premature.  See Response at 10-12.  Additionally, Ironshore maintains that it has no duty to defend KB Home because Liberty Mutual has already agreed to do so, id. at 12-13, and because the Policy's CP Exclusion bars coverage, id. at 14-17.[8]

## II.      Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The

---

[8] Ironshore also argues, in conclusory fashion, that the Policy does not provide coverage for the claims alleged by the plaintiffs in the Underlying Complaints because they do not allege "property damage caused by an 'occurrence' as defined in the Ironshore Policy," and because other Policy exclusions apply to preclude coverage.  See Response at 10.  However, these conclusory arguments are only briefly mentioned in the "Factual and Procedural Background" of the Response, and Ironshore has submitted no discussion or legal analysis to support these statements.  As such, the Court will not consider these arguments.  See generally SSH2 Acquisitions, Inc. v. Howard, Case No. 10-cv-61703, 2012 WL 668042, at *3 (S.D. Fla. Feb. 29, 2012) ("Generally, a 'litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point.  The court will not do his research for him.'" (quoting Phillips v. Hillcrest Med. Ctr., 244 F.3d 790, 800 (10th Cir. 2001))).

record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Rule 56(c)(1)(A).[9]  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the

---

[9] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive."  Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013).  Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.   Applicable Law

Under Nevada law,[10] insurance contracts are interpreted "from the perspective of one not trained in law or in insurance, with the terms of the contract viewed in their plain, ordinary and popular sense." Century Sur. Co. v. Casino W., Inc., 329 P.3d 614, 616 (Nev. 2014) (internal quotation marks and citation omitted).  When interpreting an insurance policy, courts should "consider the policy as a whole to give reasonable and harmonious meaning to the entire policy. . . ." Id.  Moreover, because insurance policies are contracts of adhesion, they "should be interpreted broadly, affording the greatest possible coverage to the insured." Farmers Ins. Grp. v. Stonik, 867 P.2d 389, 391 (Nev. 1994).  Nevertheless, a court cannot rewrite the policy's provisions if they "are otherwise unambiguous." Id.

---

[10] Ironshore asserts that the Policy "should be interpreted according to Nevada law," see Response at 14, and also states that it issued the Policy in Nevada.  Id. at 6.  KB Home does not advocate for the application of either Florida or Nevada state law.  Instead, KB Home suggests that the Court need not resolve this choice of law problem, because "[t]he legal standards applicable to Ironshore's duty to defend are the same under both Florida and Nevada law."  Reply at 9.  Notably, both parties cite to Florida and Nevada authority.  The Policy does not appear to contain a typical choice of law provision, but it does state that it was "issued pursuant to the Nevada insurance laws[.]"  Policy at 2.  Moreover, it appears from the Policy that the main named insured—Integrity Wall Systems, Inc.—is based in Nevada, see id., and KB Home does dispute Ironshore's assertion that the Policy was issued in Nevada.  Thus, the Court will assume, without deciding, that Nevada law applies.  Importantly, however, the Court agrees with KB Home that the outcome of the Motion would be the same if the Court applied Florida law instead.

Additionally, Nevada law instructs that an insurer's duty to defend is determined "by comparing the allegations of the complaint with the terms of the policy." See United Nat'l Ins. Co. v. Frontier Ins. Co ., 99 P.3d 1153, 1158 (Nev. 2004).  "[A]n insurer's duty to defend is triggered whenever the potential for [coverage] arises . . . ." Benchmark Ins. Co. v. Sparks, 254 P.3d 617, 621 (Nev. 2011); See also Maryland Cas. Co. v. Nationwide Ins. Co., 76 Cal. Rptr. 2d 113, 120 (Cal. 4th Ct. App. 1998) ("An insurer must defend any action that asserts a claim potentially seeking damages within the coverage of the policy.").[11]  "A potential for coverage only exists when there is arguable or possible coverage." United Nat'l, 99 P.3d at 1158.  Significantly, "[i]f there is any doubt about whether the duty to defend arises, this doubt must be resolved in favor of the insured." Id.  The Nevada Supreme Court has explained that "[t]he purpose behind construing the duty to defend so broadly is to prevent an insurer from evading its obligation to provide a defense for an insured without at least investigating the facts behind a complaint." Id.

## IV.   Analysis

### A.    Factual Disputes

The Court begins its analysis by addressing Ironshore's conclusory argument that there are material facts in dispute that preclude KB Home from obtaining partial summary judgment regarding Ironshore's duty to defend. See Response at 11-12.  In support of this argument, Ironshore recites the summary judgment standard but points to no material facts

---

[11] "In the context of interpreting insurance policy terms, the Nevada Supreme Court has often looked to persuasive precedent from other jurisdictions, especially California." Zurich Am. Ins. Co. v. Coeur Rochester, Inc., 720 F. Supp. 2d 1223, 1235 n.11 (D. Nev. 2010).  See e.g., United Nat'l, 99 P.3d at 1158 (citing California law).

that are actually in dispute and offers no analysis as to why summary judgment is

inappropriate.  See id.  As an initial matter, Ironshore states:

> A district court may grant summary judgment in the early stages
> of discovery **only** if further discovery would be pointless and the
> movant is clearly entitled to summary judgment. . . .  If discovery
> sought is relevant to the issues presented in the motion for
> summary judgment, the opposing party should be allowed the
> opportunity to utilize the discovery process to gain access to the
> requested materials. . . .
>
> The rule is no different here, where the existence of a disputed
> issue of material fact will, and should, preclude a party from
> obtaining summary judgment on coverage issues. . . .
> Additionally, when coverage determinations hinge on factual
> issues, summary judgment is simply premature if requested prior
> to the parties undertaking meaningful discovery.

Id. at 11 (internal citations omitted).  The Court finds this argument to be unavailing.

Because the duty to defend is determined "by comparing the allegations of the complaint

with the terms of the policy," United Nat'l, 99 P.3d at 1158, the existence of a duty to defend

is a legal question, which is amenable to resolution on a motion for partial summary

judgment.  See generally Powell v. Liberty Mut. Fire Ins. Co., 252 P.3d 668, 672 (Nev.

2011) ("The interpretation of an insurance policy presents a legal question.").  Indeed,

discovery of extrinsic evidence would appear to be irrelevant for the purpose of determining

Ironshore's duty to defend in the Underlying Litigation.  Assuming arguendo that it would

be appropriate to consider extrinsic evidence regarding Ironshore's duty to defend,

Ironshore has not pointed to any such evidence for the Court to consider.  Although

Ironshore suggests that discovery is needed, it has not explained what evidence it needs

to support its position that it does not have a duty to defend KB Home in the Underlying Litigation.[12]

The Court notes that in the "Factual and Procedural Background" portion of its Response, Ironshore states that "not every [Underlying] Complaint claims that [KB Home] is vicariously liable for any action attributable to [FSP] and [FSP] is not named in any of the [U]nderlying Complaints." Response at 9. However, Ironshore has presented no basis for the Court to disregard the evidence submitted by KB Home that the 83 Underlying Complaints at issue all contain allegations of vicarious liability and implicate FSP's allegedly defective work. See Asay Declaration. The Court is satisfied that with the Asay Declaration KB Home has met its burden of demonstrating through record evidence that there are no genuine issues of material fact regarding the allegations of the Underlying Complaints. Although KB Home has produced the Underlying Complaints to Ironshore, Ironshore has not come forward with an example of any Underlying Complaint that does not allege vicarious liability or that fails to implicate FSP's work. Moreover, despite having access to all of the Underlying Complaints, Ironshore fails to point to any record evidence casting doubt on Asay's sworn declaration that the Underlying Complaints "contain materially identical counts/claims and allegations." Asay Declaration at 3.

---

[12] Ironshore has failed to make an adequate showing under Rule 56(d) that additional discovery is warranted. Specifically, Rule 56(d) provides that:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>> (1) defer considering the motion or deny it;
>> (2) allow time to obtain affidavits or declarations or to take discovery; or
>> (3) issue any other appropriate order.

See Rule 56(d). As such, a Rule 56(d) motion "'must be supported by an affidavit which sets forth with particularity the facts the moving party expects to discover and how those facts would create a genuine issue of material fact precluding summary judgment.'" See Garner v. City of Ozark, 587 F. App'x 515, 518 (11th Cir. 2014) (quoting Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1280 (11th Cir. 1998)). Ironshore raises a generalized need for discovery but fails to explain why it cannot present the facts necessary to its opposition without it.

Ironshore simply presents no authority or analysis to support its conclusory argument that the coverage determinations in this case "hinge on factual issues," which require more "meaningful discovery." See Response at 11.  To the contrary, the Court concludes that the record establishes that the Underlying Complaints sufficiently allege "property damage," caused by the "occurrence" of FSP's allegedly faulty workmanship.  In addition, the Court finds that the Underlying Complaints include allegations of damage to property other than FSP's own work.  Specifically, the Underlying Complaints allege that FSP's faulty stucco installation caused damage to other property—paper backing, house wrap, wood sheathing, interior walls, interior floors.  Finally, the Court concludes that the Underlying Complaints can be fairly read to allege potentially covered property damage that occurred within the Policy period.  Pursuant to the additional insured endorsement, KB Home is also potentially covered for the claims against it relating to the damage allegedly caused by FSP's faulty workmanship, unless the Court determines that Liberty Mutual's defense obligations relieve Ironshore of its obligations, or that the CP Exclusion applies to preclude coverage.

**B.    Liberty Mutual**

Next the Court turns to Ironshore's contention that it does not have a duty to defend KB Home because "Liberty Mutual has already agreed to defend KB Home and there is no right to contribution in Florida."  Response at 12.  Ironshore maintains that based on caselaw regarding the right to contribution between insurers "and Liberty Mutual's explicit acceptance of the full duty to defend KB Home, it would be inappropriate and not possible for Ironshore to take on the duty to defend Ironshore in this matter . . . ."  Id. at 13.  Upon review, the Court finds Ironshore's reliance on Florida law regarding the right to contribution

between insurance companies to be unavailing.  First, although not applicable to this action, the Court notes that the Florida Legislature recently created a right of contribution among liability insurers for defense costs.  See Fla. Stat. § 624.1055 (2019).[13]  More importantly, even though Florida law has not always allowed contribution "between insurers for expenses incurred in defense of a mutual insured," Argonaut Ins. Co. v. Maryland Cas. Co., 372 So. 2d 960, 963 (Fla. 3d Dist. Ct. App. 1979), that does not mean that Florida law permitted an insurer to shirk its contractual defense obligations simply because another insurer had already recognized its duty to defend.  Indeed, in the very case on which Ironshore relies, after acknowledging that the Florida "Legislature ha[d] not seen fit to allow contribution for costs or attorney's fees between insurance companies," the Third District Court of Appeal (DCA) in Argonaut went on to emphasize the personal nature of an insurer's duty to defend:

> The agreement to defend contemplates the rendering of services. The insurer must investigate, and conduct defense, and may if it deems it expedient, negotiate and make a settlement of the suit. These matters each insurer is required to do regardless of what the other insurer is doing.  While both may join together in the services and share expenses, there is no requirement that they do so.  Conceivably, one might disagree with the other as to the strategy of the investigation and defense.  It could act independently of the other.  Thus the relationship is more that of co-insurer than cosurety.  As to the assured, neither one is excused to any extent from its full duty to defend, no matter what the other does. The duty to defend is personal to the particular insurer. It is not entitled to divide that duty with or require contribution from the other.

Argonaut, 372 So. 2d at 963 (quoting Financial Indemnity Co. v. Colonial Ins. Co., 132 Cal. App. 2d 207 (Cal. 1st Ct. App. 1955)).

---

[13] "Section 624.1055, Florida Statutes, . . . applies to any claim, suit, or other action initiated on or after January 1, 2020."  Fla. Stat. Ann. § 624.1055.

Thus, the presence of multiple insurers has never excused any single insurer from fully defending the insured.  See id.  See also U.S. Fire Ins. Co. v. Transp. Cas. Ins. Co., 747 So. 2d 404, 405 (Fla. 4th Dist. Ct. App. 1999) ("We hold that the trial court correctly determined in a partial summary judgment that both carriers should provide pro-rata primary insurance coverage, and that they had a duty to defend the three defendants on a pro-rata basis."); Cont'l Cas. Co. v. United Pac. Ins. Co., 637 So. 2d 270, 273 (Fla. 5th Dist. Ct. App. 1994) ("As a practical matter, [carrying out the contractual duty to defend in multiple coverage cases] happens in a variety of ways, depending on the circumstances. Sometimes carriers will agree to select an attorney who is on the 'approved' list for each carrier and will split defense costs.  Sometimes both carriers will hire counsel and provide legal representation, but with the understanding that the attorney hired by the carrier with the highest exposure will be lead counsel, assisted by the other.  Sometimes, the defense functions are simply divided to save expenses and duplication of effort.").  Accordingly, the Court concludes that Liberty Mutual's recognition of its defense obligations does not relieve Ironshore of its own.[14]

---

[14] Ironshore does not argue that its coverage is excess over Liberty Mutual's coverage.  This is likely because both policies contain standard "other insurance" provisions, see Ironshore Policy at 14; Liberty Mutual Policy at 75, which "state that they will not serve as primary insurance where there is other applicable insurance."  Certain Underwriters at Lloyds, London Subscribing to Policy No. SA 10092-11581 v. Waveblast Watersports, Inc., 80 F. Supp. 3d 1311, 1321 (S.D. Fla. 2015) (internal quotation marks and citation omitted).  "Thus, the other insurance clauses are mutually repugnant and cancel each other out in entirety . . . ."  Id.  See also Travelers Ins. Co. v. Lexington Ins. Co., 478 So. 2d 363, 365 (Fla. 5th Dist. Ct. App. 1985) ("In Florida, where two insurance policies contain excess insurance clauses the clauses are deemed mutually repugnant and both insurers become primary and share the loss on a pro rata basis in accordance with their policy limits."); Travelers v. Lopez, 567 P.2d 471 (Nev. 1977) (holding "other insurance" clauses to be void where they conflict with similar clauses in the other policy of insurance and that an insurance company cannot "defer or limit its liability" on the basis of the availability of other insurance).

### C.    CP Exclusion

Finally, the Court considers whether the CP Exclusion bars any potential for coverage and therefore negates Ironshore's duty to defend.  As stated above, this provision bars coverage for "continuous or progressive injury or damage" that "first existed, or is alleged to have first existed, prior to the inception of" the Policy.  See Policy at 31.  The CP Exclusion further provides that damage resulting from the insured's work "performed prior to policy inception will be deemed to have first existed prior to the policy inception, unless such 'property damage' is sudden and accidental and takes place within the policy period." Id. (emphasis added).  In its Response, Ironshore asserts that because it is undisputed that FSP completed its work in 2008, and that the Policy was not effective until December 1, 2009, the alleged property damage caused by FSP's defective work is deemed to have first existed before the inception of the Policy and, as such, there is no potential for coverage.  See Response at 14-17.  KB Home does not dispute that FSP completed its work in 2008 before the Policy's inception date.  See Reply; Amended Complaint at 4. Instead, KB Home maintains that, regardless of when the property damage resulting from FSP's work first existed, the sudden and accidental exception to the CP Exclusion applies, because the Underlying Complaints do "not specifically identify when or how the deficiencies and damages occurred."  See Reply at 11-14.  As such, KB Home contends that the Underlying Complaints potentially seek covered damages, which triggers Ironshore's duty to defend.  Id.

To support their respective positions, the parties cite to two opinions of the Nevada District Court, which both addressed the CP Exclusion in similar circumstances but reached different results.  See Response at 14-17 (citing Assurance Co. of Am. v. Ironshore

Specialty Ins. Co., Case No. 2:15-cv-460-JAD-PAL, 2017 WL 3666298, at *1 (D. Nev. Aug. 24, 2017) (Assurance II)); Reply at 12-14 (citing Assurance Co. of Am. v. Ironshore Specialty Ins. Co., Case No. 2:13-cv-2191-GMN-CWH, 2014 WL 4829709 (D. Nev. Sept. 30, 2014) (Assurance I)).  In both Assurance cases Ironshore argued that the policy's CP Exclusion precluded any potential for coverage in underlying construction defect lawsuits because the insured completed its work before the policies' inception date, and the underlying complaints did not specifically allege any sudden or accidental damages such that the exception to the CP Exclusion would apply.

In ruling in Ironshore's favor, the district court in Assurance II stated:

> The plaintiffs maintain that the allegations against the insureds in the underlying actions create a potential for coverage triggering Ironshore's duty to defend under its policy.  They reason that although the complaints did not allege that any sudden accidents happened, they also did not expressly state there were no such accidents.  In short: because the insureds were sued for causing property damage, and because causing property damage could, in theory, include an accident—there is a potential for coverage triggering the duty to defend.

> The plaintiffs' argument would expand the duty to defend to the breaking point.  Before the duty is triggered, there must be some allegation or evidence to create a current potential for coverage.  And an allegation that is so vague that it could possibly encompass covered allegations in the future is not enough.  Not only are there no actual allegations here that a sudden accident occurred, there is not even the suggestion of an accident in any of the complaints.  The thrust of the complaints is that the insureds defectively built homes before Ironshore's policies started.  And that claim is precisely what Ironshore's policies exclude: claims related to an insured's work performed prior to the policy-start date.  The parties' policies are explicit about this exclusion.

> Without any existing evidence or allegations giving rise to a potential for covered liability, there is no present duty to defend.  Taking all of the allegations in the underlying complaints and the extrinsic evidence offered here, there is no indication that the

insureds were being sued for an act covered by Ironshore's policy.  There was thus no duty to defend.

Assurance II, 2017 WL 3666298, at *3.

In contrast, the district court in Assurance I determined that, based upon the allegations of the underlying complaint, the CP Exclusion did not preclude "all possible or arguable coverage because the 'sudden or accidental' exception could have been implicated." Assurance I, 2014 WL 4829709, at *3-4.  In so holding, the district court stated:

> [T]he [underlying] Complaint alleged "damages stemming from, among other items, defectively built roofs, leaking windows, dirt coming through windows, drywall cracking, stucco cracking, stucco staining, water and insect intrusion through foundation slabs, and other poor workmanship." . . .  Moreover, the [underlying] Complaint alleged that "[w]ithin the last year, Plaintiffs have discovered that the subject property has and is experiencing additional defective conditions, in particular, there are damages stemming from, among other items, defectively built roofs, leaking windows, dirt coming through windows, drywall cracking, stucco cracking, stucco staining, water and insect intrusion through foundation slabs, and other poor workmanship." . . .  The Court finds that the [underlying] Complaint is vague as to the temporal implications of the alleged damages, and therefore, it is not clear on the face of the [underlying] Complaint whether the alleged damages were or were not sudden and accidental.  Accordingly, this exclusion alone did not preclude all possible or arguable coverage.

Id. at 4.

Upon consideration, the Court concludes that the reasoning of Assurance I is more persuasive given the Nevada authority cited above regarding the duty to defend.  Indeed, Nevada law is clear that "an insurer's duty to defend is triggered whenever the potential for [coverage] arises," Benchmark, 254 P.3d at 621, and a potential for coverage "exists when there is arguable or possible coverage," United Nat'l, 99 P.3d at 1158.  Here, the plaintiffs allege in the Underlying Complaints that "[s]ubsequent to construction of the Home, certain

design and construction deficiencies were observed at the Home, which include, but are not limited to, an inadequately and improperly installed stucco system."  Gilbert Complaint at 3; <u>see also</u> Rowland Complaint at 3.  The plaintiffs further allege that "[t]he existence or causes of the defects are not readily recognizable by Plaintiffs," and that "[t]he defects are hidden by components or finishes, are latent in nature, and are defects that require special knowledge or training to ascertain and determine the nature and causes of the defects." Gilbert Complaint at 3-4; <u>see also</u> Rowland Complaint at 3-4.  However, the Underlying Complaints are silent as to when FSP's allegedly faulty workmanship began to physically damage other parts of the Project or when that alleged property damage was discovered. Nor are there any allegations regarding the nature of the property damage caused by FSP's allegedly faulty workmanship from which this Court could infer that the property damage was more likely gradual and nonaccidental, as opposed to sudden and accidental.[15]  As such, the Court finds that the CP Exclusion does "not preclude all arguable or possible coverage under the Ironshore Policy."  <u>See</u> <u>Assurance I</u>, 2014 WL 4829709, at *4; <u>Leonard Roofing, Inc. v. Ironshore Specialty Ins. Co.</u>, Case No. 12-cv-156-VAP-DTB, 2013 WL 12129653, at *10 (C.D. Cal. Mar. 29, 2013) ("[I]t is entirely possible that the plaintiffs are seeking sudden and accidental damage caused by water damage that first occurred during the policy period.  As Ironshore has failed to prove that there was no possibility of coverage at the time of tender, Ironshore is not entitled to summary adjudication regarding the duty to defend Leonard in the [underlying action].").  <u>See also</u> <u>Wynn's Intern., Inc. v. Cont'l Ins.</u>

---

[15] The Court is not aware of any Nevada authority interpreting a sudden and accidental exception in an insurance policy.  Notably, however, the Florida Supreme Court has determined that the word sudden in a sudden and accidental exception to an environmental exclusion means happening abruptly and unexpectedly.  <u>See</u> <u>Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.</u>, 636 So. 2d 700 (Fla.1993).

Co., Case No. 94-cv-3766-CAL-ENE, 1995 WL 498846, at *4 (N.D. Cal. Aug. 14, 1995) (analyzing a chemical exclusion with a similar sudden and accidental exception and concluding that "[w]here the charging complaint is silent on the question of whether a release is sudden or gradual, that is enough to trigger the duty to defend"); Nat'l Fire & Marine Ins. Co. v. Redland Ins. Co., 3:13-cv-00144-LRH, 2014 WL 3845153, at *5 (D. Nev. Aug. 5, 2014) ("Because the date on which the property damage occurred is not ascertainable from the Underlying Complaint, the Court cannot conclude that there was no potential for arguable or possible coverage under the policies . . . .").[16]  Thus, the Underlying Complaints potentially seek damages within the coverage of the policy.

Because the Court is required to resolve any doubts as to a duty to defend in favor of the insured, and because an insurer must defend if the allegations against the insured allege facts potentially and even only partially within coverage, see United Nat'l, 99 P.3d at 1158, the Court determines that Ironshore has a duty to defend KB Home in the Underlying Litigation with respect to the 83 Underlying Complaints at issue in the Motion.

Accordingly, it is

**ORDERED**:

---

[16] The Court has not identified any Florida authority addressing a CP Exclusion.  Even so, the Court is of the view that the result would be the same under Florida law.

Plaintiff KB Home Jacksonville LLC's Motion for Partial Summary Judgment Against Defendant Ironshore Specialty Insurance Company and Incorporated Memorandum of Law (Doc. 52) is **GRANTED** to the extent the Court declares that Ironshore has a duty to defend KB Home in the Underlying Litigation with respect to the 83 Underlying Complaints at issue in the Motion.

**DONE AND ORDERED** in Jacksonville, Florida on September 5, 2019.

**MARCIA MORALES HOWARD**
United States District Judge

lc23
Copies to:
Counsel of Record